UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   NEW MEXICO TERMINAL SERVICES, LLC,                    No. 25-11291-j11

Debtor.

**<u>MEMORANDUM OPINION</u>**

The matter before the Court is Century Bank's Emergency Motion to Appoint Chapter 11

Trustee Pursuant to 11 U.S.C. § 1104 filed December 10, 2025 (Doc. 60) as supplemented by the

Amended Emergency Motion to file Supplement to, or Amend, Motion to Appoint Chapter 11

Trustee Pursuant to 11 U.S.C. § 1104 (Doc. 87) and Century Banks's Amended Second

Supplemental Motion to Emergency Motion to Appoint Chapter 11 Trustee filed January 13,

2026 (Doc. 132) (together, the "Motion to Appoint a Trustee"). Debtor filed a response and

opposition to the Motion on December 24, 2025 (Doc. 99).

<u>FINDINGS OF FACT</u>

This case is a single asset real estate case. Debtor's goal in this chapter 11 case is to

maximize value from the sale of its real property located at 9615 Broadway Blvd. SE, in

Albuquerque (the "Property") to pay all creditors in full and yield a substantial surplus for

Debtor's members. The Property is part of an economic development project ("Development

Project") that contemplates the installation of railroad siding track to run parallel to the main

track that would allow large loading, unloading, and transloading in the area using one or more

spurs off the new track. Debtor's hope is to sell the Property in a private sale after it completes

the installation of railway improvements consisting of at least switches to enhance the value of

the Property, but Debtor agrees to sell the Property by auction, as is, if a private sale agreement is

not reached withing six months after the Court approves the Debor's employment of a broker to

market the Property. Debtor's installation of the switches has stalled for lack of funds. Debtor has been seeking a grant from the New Mexico Economic Development Department to obtain funds to complete its portion of the Development Project.

Karl Pergola, Debtor's principal, has been paying Debtor's operating expenses post-petition incurred prior to a sale by making loans to Debtor. Through the end of January 2026, Karl Pergola made post-petition loans to Debtor totaling $71,721.45: insurance ($25, 521.45); taxes and an annual New Mexico Department of Transportation ("NMDOT") license fee ($24,000); a retainer to a company employed by Debtor to appraise the Property ($15,000); a retainer to new chapter 11 counsel ($20,000); and trash cleanup of the Property ($500). There is no evidence before the Court that a chapter 11 trustee would have access to any funds prior to the closing of a sale of the Property.

Debtor acquired the Property with known contamination and with the responsibility to remediate the Property. Debtor's principal creditor and lender, Century Bank, has lost confidence in and does not trust Karl Pergola. Debtor has not undertaken action to remediate the Property and has not paid Century Bank. Likewise, Cal-Maine Foods, Inc. ("Cal-Maine"), which remains a responsible party to remediate the Property, has lost confidence in and does not trust Karl Pergola. Cal-Maine has filed an unsecured pre-petition claim in the amount of $989,877.20, which Debtor disputes, to cover the cost of remediating the Property. Cal-Maine also commenced an adversary proceeding in which it objects to dischargeability of debt under 11 U.S.C. § 523(a), alleging, among other things, that that Debtor has knowingly and intentionally failed to comply with mandatory environmental abatement requirements with respect to the Property imposed by the State of New Mexico.

Debtor's original schedules of assets and liabilities and its statement of financial affairs filed by Debtor's then counsel, who is not experienced chapter 11 counsel, were deficient in various respects. About a month after commencement of this chapter 11 case, Debtor located and retained new counsel, who amended the schedules and statement of financial affairs and corrected other deficiencies. Debor's current lead counsel is an experienced, highly competent chapter 11 lawyer.

*Ownership of the Property, Notice of Settlement with NMED,*
*Seller Indemnification, and Debtor's Loan from Century Bank*

Prior to 2015, Cal-Maine owned the Property and operated an egg production facility on the site. The operation of the egg production facility resulted in contamination of soil at the site and groundwater beneath the site. In February of 2012, Cal-Maine entered into a settlement agreement (the "Settlement Agreement") with the New Mexico Environment Department ("NMED"). The Settlement Agreement provides that it remains in effect until Cal-Maine "completes [a]batement pursuant to 20.6.2.4112 NMAC or it is terminated by written agreement of the parties." NMED required Cal-Maine to disclose the Settlement Agreement to any successor in interest and to advise any successor in interest that the Settlement Agreement was binding on the successor in interest until such time as Cal-Maine complies with the terms and conditions of the agreement or it is terminated by Cal-Maine and NMED.

The Settlement Agreement also provides that if NMED conditionally determines that a third-party purchaser, or prospective purchaser, of the Property is eligible for a Voluntary Remediation Program[1] ("VRP"), NMED would suspend action to enforce the remediation requirement of the Settlement Agreement against Cal-Maine. The Settlement Agreement further

---

[1] "The purpose of the Voluntary Remediation Program is to provide incentives for the voluntary assessment and remediation of contaminated property, with state oversight, and to remove future liability of lenders and landowners." Exhibit 1, p. 15, Settlement Agreement (internal quotes omitted).

provides that if NMED or the third-party purchaser terminates the Settlement Agreement under the VRP, the suspension of action to enforce the remediation requirement would be terminated and Cal-Maine's obligation to abate groundwater contamination at the Property would remain in full force and effect, and that any owners or lessees of the site are also considered responsible persons for purposes of abatement of groundwater contamination.[2]

On January 15, 2015, Rock House CGM, LLC ("Rock House")[3] executed a real estate purchase and sale agreement ("Purchase Agreement") under which Cal-Maine agreed to sell, and Rock House agreed to purchase the Property, for $2,500,000. Karl Pergola, as "president" of Rock House, signed the Purchase Agreement on behalf of Rock House. The agreed sales price of the Property was discounted because of the soil and water contamination existing on the Property at the time of the sale. Under the Purchase Agreement, Rock House agreed to "indemnify, defend, protect and hold [Cal-Maine] harmless from and against any and all claims, actions, causes of action, demands, liabilities, damages, costs and expenses (including reasonable attorneys' fees) . . . on account of the following with respect to the Property: (a) the physical condition, nature or quality of the Property (including the soils and groundwater on and under the Property to the extent hazardous substances are involved); and (b) [Cal-Maine's] presence on, management of, remediation or operations on the Property."[4]

On December 31, 2014, Rock House sent a letter via certified mail, signed by Karl Pergola as its managing member, to NMED acknowledging that Rock House had "been furnished with a copy of the requirements of the New Mexico Environment Department under

---

[2] Exhibit 1, p. 17, Settlement Agreement.
[3] Karl Pergola testified that Rock House was a track installation and maintenance contractor for Burlington Northern Railroad. Karl Pergola testified that at some point Burlington Northern Railroad moved those operations in-house, and the market went away.
[4] Exhibit 1.

- 4 -

the New Mexico Water Quality Act and the Water Quality Control Commission . . . regulations based on activities that predate the purchase, sale and transfer of [the Property]" and that Rock House would be "designated as the responsible person pursuant to 20.6.2.4104.B NMAC and shall be responsible for conducting all activities required under the abatement plan and the WQCC[5] regulations."[6]

On November 1, 2016, the Property was transferred from Rock House to Debtor by warranty deed recorded in the real estate records of the Bernalillo County Clerk in the State of New Mexico. Karl Pergola signed the Warranty Deed on behalf of Rock House as its managing member. Karl Pergola and Cristina Martinez together own 100% of the membership interests in the Debtor. Karl Pergola is Debtor's managing member.

On March 5, 2019, Debtor, by its managing member, Karl Pergola, executed a promissory note (the "Note") payable to Century Bank in the amount of $2,980,000 that evidenced a loan form Century Bank to Debtor. As security for the loan (the "Loan"), Debtor granted Century Bank a mortgage lien on the Property. The Note matured on March 5, 2024. On March 20, 2025, Century Bank and Debtor entered into a settlement and forbearance agreement ("Forbearance Agreement"). On March 31, 2025, pursuant to the Forbearance Agreement, a Stipulated Judgment and Order of Foreclosure was entered in state court (the "Stipulated State Judgment"). The Stipulated State Judgment awarded Century Bank $3,063,521.78, representing the unpaid balance of principal and interests under the Note plus fees, and provided for further intertest accrual. The Forbearance Agreement provided that Debtor would be given a $300,000 discount if Debtor paid the Stipulated State Judgement in full by September 15, 2025. Debtor failed to make payment required under the Forbearance Agreement. On September 16, 2025, a

---

[5] "WQCC" is the New Mexico Water Quality Control Commission.
[6] Exhibit 2.

Notice of Sale of the Property was filed in state court. A foreclosure sale of the Property was scheduled for October 20, 2025. A few days before the scheduled foreclosure sale, on October 16, 2025, Debtor filed its petition for relief under chapter 11 thereby commencing this bankruptcy case.

<u>The VRA, VRP, and Access for Environmental Work.</u>

On January 19, 2017, NMED sent a letter to Karl Pergola and Cristina Martinez and enclosed a Voluntary Remediation Agreement ("VRA"). The VRA stated that Debtor, as "participant," was eligible to participate in the VRP and set forth the details of the "obligations and functions of each party relevant to the remediation to be conducted at the [Property]." The VRA bound "the participant, its officers, managing agents, directors, principals, partners, employees, receivers, trustees, agents, parents, subsidiaries and affiliates, . . . and the [NMED]. Karl Pergola signed the VRA as Debtor's authorized representative on January 6, 2017. The VRA required the responsible party to perform abatement of the soil and groundwater contamination present at the Property until the levels of contamination met state standards. In return for successful completion of the final voluntary remediation work plan for the contamination covered by the VRA, NMED would grant the owner of the Property, who did not contribute to the contamination, a covenant not to sue. This would increase the value of the Property.

NMED sent a notice to Karl Pergola on April 12, 2019, notifying him that he was not in compliance with the approved final voluntary remediation work plan agreed to in the VRA. On October 4, 2021, NMED sent a letter to Karl Pergola and Cristina Martinez stating that the request submitted by Mr. Pergola's and Ms. Martinez's contractor to close the site was denied

- 6 -

because Debtor had not satisfied the conditions in the VRA.[7] On January 26, 2023, NMED sent to Debtor a "Final Notice to Submit a Voluntary Remediation Work Plan for New Mexico Terminal Services Site in Albuquerque."[8] On April 18, 2023, NMED sent an email to Karl Pergola addressing the requirements for sending notice of intention to terminate the VRA. On April 18, 2023, Karl Pergola responded to the email from NMED:

> Ms. Cook,
> Thanks for the conversation today. Based on Karler data, NMTS data and your professional opinion regarding Western Organics, Karler and the south valley, I will terminate my VRP. I will mail a certified letter per NM code.
> Thanks, Karl[9]

On August 22, 2023, NMED sent an email to Karl Pergola stating that the VRA for the Property was terminated and that, although the termination would "trigger a notification to Cal-Maine Foods of their renewed remediation obligations, termination of the VRA does not release you from your obligation to remediate the environmental contamination at the property."[10] "Further, NMED is aware that you have placed the property up for sale. Sale of the property does not automatically release you of your remediation obligations under the Ground and Surface Water Protection Regulations."[11] On December 13, 2023, NMED sent an email to Karl Pergola informing him that, although Debtor owned the Property at the time, he was the "current listed owner and identified responsible person of property requiring abatement."[12]

On April 29, 2024, NMED sent a letter to Debtor and Cal-Maine discussing Cal-Maine's response to NMED's request to restart the environmental assessment of the Property and the need for a current environmental assessment because of the "multi-year hiatus in environmental

---

[7] Exhibit 5, p. 3
[8] *Id.* at 5.
[9] *Id.* at 7.
[10] *Id.* at 8.
[11] *Id.*
[12] *Id.* at 10.

data collection and maintenance efforts" at the Property.[13] The letter also stated that per New Mexico regulations Cal-Maine was "required to conduct all investigation, abatement, monitoring, and reporting activity according to the terms and conditions contained in the [Stage 1 Abatement Plan Former Cal-Maine Egg Plant Bernalillo County, New Mexico, dated February 2024] S1AP."[14] Cal-Maine was also responsible for obtaining permission to enter the Property. Debtor interpreted this letter to mean that Debtor had no more liability for the remediation of the Property. Because of the agreements Debtor entered into with Cal-Maine and NMED, the requirements of applicable laws and regulations, and correspondence with NMED, this is not a reasonable interpretation of the April 29, 2024, letter from NMED.

On August 7, 2024, Cal-Maine sent to Karl Pergola a proposed access agreement between Rock House and EA Engineering, Science, and Technology, Inc. ("EA Engineering") under which EA Engineering would be granted access to the Property to "conduct Site Investigation and Abatement on behalf of Cal Maine Foods, Inc."[15] The access agreement provided protection for Debtor in the event someone was injured as a result of EA Engineering's access to the Property in the form of an indemnity against loss and an insurance requirement. Karl Pergola, acting for Debtor, refused to sign the proposed access agreement. At the March 2026 hearing on Century Bank's Emergency Motion to Appoint Chapter 11 Trustee, Karl Pergola testified that he refused to sign the access agreement because he was concerned about the Debtor's liability if EA Engineering was given access to the Property under a written access agreement. Karl Pergola further testified that he told Mr. Domenici, counsel for Cal-Maine, that EA Engineering could enter the Property, but that he did not want it in writing. These are not good reasons to refuse to

---

[13] Exhibit 6, p. 1.
[14] *Id.*
[15] Exhibit 7, p. 7.

sign the access agreement, and it was unreasonable for Debtor to refuse to sign the proposed access agreement. Debtor was exposed to possible liability for injuries on the Property regardless of whether permission to access the Property was granted in writing, and a grant of access without signing the access agreement would deprive Debtor of the indemnity and insurance protections of the agreement. Debtor also carried its own insurance. At the March 2026 hearing on the Motion to Appoint a Trustee, Karl Pergola testified that he would do what his attorney told him to do with respect to granting access to the Property.

Debtor eventually signed an access agreement on December 11, 2025, the day of the hearing on Cal-Maine's Emergency Motion for an Order Requiring the Debtor-in-Possession or in the Alternative Appoint a Special Master to Sign the Access Agreement Allowing EA Engineering Science and Technology, Inc. to Access the Real Property Located at 9615 Broadway SW, Albuquerque, New Mexico (Doc. 57). The agreement signed by Debtor on December 11, 2025, is materially the same as the proposed access agreement sent by Cal-Maine to Debtor on August 7, 2024.

Even after Debtor signed the access agreement, EA Engineering was only able to access the site through an adjacent property because the gate at the entrance to the Property remained locked. EA Engineering accessed the Property and completed the site assessment. EA Engineering produced an estimate of costs to Cal-Maine for abatement and monitoring of the Property. The estimated cost for abatement and monitoring was $826,125.[16]

The Development Project

Completion of the Development Project would significantly increase the Property's value. Debtor, through Karl Pergola, has put much effort into the Development Project. Debtor

---

[16] Exhibit 10, p. 1.

entered into an agreement with Bernalillo County, New Mexico for construction of railway

siding and road access to the Property on March 23, 2021. The construction of railway siding

improvements and road access under the agreement with Bernalillo County was divided into

three parts: Part A (road improvements and infrastructure improvements to Broadway and the I-

25 off-ramp); Part B (railway siding improvements consisting of construction of track along the

Railrunner Express tracks within NMDOT right-of-way); and Part C (developer improvements

on the Property consisting of or including the installation of switches).

Bernalillo County was responsible for the work under parts A and B; Debtor was

responsible for work under part C. Bernalillo County agreed to provide this work because the

project would "enhance the economic use of Developers [Debtor's] property and will contribute

towards the development of the larger Sunport Economic Development District within the

County."[17] The County completed its work sometime between the summer of 2024 and late

summer of 2025. Debtor has already partially constructed the Part C improvements. Herzog, the

contractor NMDOT proposed for this work, provided an estimate of $1,142,833.61 for labor only

(which did not include the cost of materials), for the remaining improvements required under

Part C.

Debtor is required to sign a NMDOT Railroad Right-of-Way License Albuquerque

Subdivision[18] (the "Railroad Right-of-Way License Agreement") before work can begin to

construct the work for which Debtor is responsible. Debtor's negotiations with NMDOT

included changing the NMDOT approved contractor for this type of project to Rusty Spike, a

contractor that Debtor proposes, who would perform the work at a lower cost.[19] Debtor's

---

[17] Exhibit 11, p. 1.
[18] Exhibit 39, p. 5.
[19] *Id.* at 4.

retention of Rusty Spike to perform the work requires NMDOT's approval. NMDOT has approved, or it appears NMDOT will approve, use of Rusty Spike.[20] Debtor has not signed the Railroad Right-of-Way License Agreement because Debtor lacks the funds to pay for completion of the Part C work. The Railroad Right-of-Way License Agreement allows Debtor to "use a certain portion of NMDOT's NMRX Railroad property . . . to construct, maintain and use a site for industry track . . . to serve an adjacent rail-truck transload facility [the Property]."[21] This allows contractors paid by Debtor to build the necessary track, turnouts, switches, and appurtenances to allow rail access to and from the Property.

At the March 2 and 3, 2026, hearing on the Motion to Appoint a Trustee, Karl Pergola testified that Debtor was in the process of obtaining funding from the New Mexico Economic Development Department ("EDD") and that he had received a letter from EDD on the Friday before the hearing stating funding for Debtor's portion of the work was approved. The letter was not offered or admitted in evidence. The Court cannot make any findings regarding EDD's approval or the amount or timing of any approved funding.

*Efforts to Market and Sell the Property, Value of the Property, and the Debtor's Chapter 11 Plan*

Debtor entered into a listing agreement with a broker for the Property on February 5, 2024. The listing agreement expired on November 1, 2024. The asking price for the Property was $19,954,000. The Property remains unsold. Although Debtor signed a listing agreement with a broker on January 3, 2026, subject to Court approval, Debtor has not filed a motion to employ a broker in this case. The Property remains unlisted currently.

---

[20] *Id.*
[21] *Id.* at 5.

At the hearing, on March 2, 2026, Karl Pergola testified the listing agreement he signed in January of 2026, subject to Court approval, listed the Property at $18,000,000. This price assumes completion of the Development Project.

*Debtor's Chapter 11 Plan*

On January 14, 2026, Debtor filed Debtor's Plan of Reorganization ("Plan" – Doc, 134) and a Disclosure Statement (Doc. 135). Paragraph 5.1 of the Plan provides:

> <u>Marketing and the Sale of Real Property.</u> The Debtor is in the process of retaining a Broker to market the Real Property. The Debtor will establish an Information Room which will contain documents and information to enable potential buyers to assess the opportunity. Prospective purchasers will be required to enter into a Nondisclosure Agreement with the Debtor to gain access to the Information Room.
>
> The Debtor intends to market the Real Property for a period of six months which will begin upon the entry of an order approving Debtor's employment of the Broker. If the Debtor has not entered into a Purchase Agreement with a prospective purchaser after six months, the Debtor will undertake an auction process that fixes a deadline for submission of bids for the Real Property.

The Plan contains no clear deadline that would trigger the six-month period or a deadline for closing a sale under a Purchase Agreement to avoid triggering an auction of the Property.

On March 3, 2026, the Court held a hearing on approval of the Disclosure Statement and fixed a deadline of 21-days after the Court enters an order on the Motion to Appoint a Trustee for the Debtor to file an amended disclosure statement (the "Amended Disclosure Statement").[22] On February 27, 2026, the Court entered an order approving Debtor's employment of an appraiser to appraise the value of the Property.[23] The appraisal will be attached to the Amended Disclosure Statement.

---

[22] *See* Order Resulting from Hearing on Disclosure Statement (Doc. 170).
[23] *See* Order Approving Debtor's Employment of Appraiser (Doc. 167).

<u>Claims Against the Estate</u>

Although the claims bar date has not passed, claims filed to date total $4,737,702.96, consisting of a claim by the New Mexio Department of Taxation & Revenue in the amount of $108,095.42, a claim by Cal-Maine in the amount of $989,877.20, a claim by Randall T. Hicks Consultants Ltd. in the amount of $38,408.04, and a claim by Century Bank in the amount of $3,601,322.30. Debtor's list of twenty largest unsecured creditors list a total of four claims, consisting of claims by Cal-Maine as a contingent, unliquidated, disputed claim, a claim by Randall T. Hicks Consultants Ltd. as contingent claim, a claim by Triple Capital LLC in the amount of $0.00 as a contingent, unliquidated, disputed claim, and a claim by the New Mexico Environment Department in the amount of $0.00 as a contingent, unliquidated, disputed claim.

In addition to these claims, there will be a broker's commission, real estate sales tax, professional fees, and possibly other post-petition claims.

## DISCUSSION

Century Bank requests the appointment of a chapter 11 trustee under 11 U.S.C. §§ 1104(a)(1) and/or (a)(2).[24] Those sections provide:

> At any time after commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>     (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>     (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.[25]

---

[24] All statutory references are to Title 11 of the United States Code, unless otherwise noted.
[25] §§ 1104(a)(1) and (a)(2).

- 13 -

Appointment of a chapter 11 trustee is an extraordinary measure because it strips the debtor of the rights, powers, and duties of a debtor in possession.[26] For this reason, unless there is a clear showing that a chapter 11 trustee is necessary, "[t]here is a strong presumption that the debtor should be permitted to remain in possession."[27] The party requesting the appointment of a chapter 11 trustee bears the burden of demonstrating "cause."[28] Both pre- and post-petition conduct are relevant.[29]

Courts are not in agreement on the required standard of proof for the appointment of a chapter 11 trustee.[30] Some require clear and convincing evidence;[31] others apply the preponderance of the evidence standard of proof.[32] The Tenth Circuit has not yet adopted a

---

[26] *In re Railyard Co., LLC*, No. 15-12386-j11, 2016 WL 1254988, at *10 (Bankr. D.N.M. Mar. 30, 2016); *see also, In re Marshall*, 653 B.R. 509, 514-15 (Bankr. N.D.N.Y. 2023) ("Ordinarily, a Chapter 11 debtor remains in control of the estate and appointment of a trustee is 'the exception, rather than the rule.'" (quoting *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y. 2006))); *In re Plaza de Retiro*, 417 B.R. 632, 640 (Bankr. D.N.M. 2009) ("[T]here is a strong presumption that a debtor should normally remain in possession . . . ." (citation omitted)).

[27] *In re Peak Serum, Inc.* 623 B.R. 609, 621 (Bankr. D. Colo. 2020) (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990)); *In re Samy*, 673 B.R. 573, 589 (Bankr. D. Kan. 2025) ("The appointment of a Chapter 11 trustee is an extraordinary remedy based on a strong presumption in favor of leaving the debtor in possession." (quoting *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011))); *In re St. Louis Globe-Democrat*, 63 B.R. 131, 138 (Bankr. E.D. Mo. 1985) ("It is well established there is a strong presumption that a debtor in possession in a reorganization case should be permitted to continue to control and manage its estate.").

[28] *Samy*, 673 B.R. at 588 ("[A] party [seeking the appointment of a chapter 11 trustee] must demonstrate clear facts indicating the necessity of a trustee under either § 1104(a)(1) or (a)(2)." (citing *In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 617 (Bankr. D. Wyo. 1995))).

[29] *Okla. Ref. Co. v. Blaik (In re Okla. Ref. Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("[P]repetition activity may be considered as part of a § 1104 determination."); *Samy*, 673 B.R. at 590 ("A debtor's prepetition activity may be considered when making the appointment decision." (citing *In re Okla Ref. Co.*, 838 F.2d at 1137)); *Plaza de Retiro*, 417 B.R. at 640 (equitable factors under § 1104(a)(2) include "the debtor in possession's past and present performance and prospects for the debtor's rehabilitation"); *Marshall*, 653 B.R. at 515 ("The court may consider both pre-petition and post-petition misconduct when deciding whether cause exists [to appoint a chapter 11 trustee].").

[30] *Samy*, 673 B.R. at 588 ("Courts remain split on the burden of proof required of the movant.").

[31] *See, e.g., In re Bayou Grp., LLC*, 564 F.3d 541, 546 (2d Cir. 2009); *In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004).

[32] *See, e.g., In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (8th Cir. BAP 2011).

Case 25-11291-j11    Doc 180    Filed 03/13/26    Entered 03/13/26 17:22:32 Page 14 of 22

standard.[33] The Court will apply the lower standard, because if the facts do not support the appointment or a chapter 11 trustee under the lower standard, the facts necessarily will not meet the clear and convincing standard.[34]

The Court enjoys a great deal of discretion[35] in determining whether "cause" exists to appoint a chapter 11 trustee under 11 U.S.C. § 1104(a)(1), or whether appointment of a trustee is in the interests of creditors and the estate under 11 U.S.C. § 1104(a)(2), but once "cause" has been established, or the Court finds that the appointment of a chapter 11 trustee best serves the interests of creditors and the estate consistent with § 1104(a)(2), the Court loses all discretion and must appoint a chapter 11 trustee.[36]

*"Cause" under § 1104(a)(1)*

When determining whether "cause" exists under § 1104(a)(1), the statute directs the Court to consider evidence of "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor."[37] The statutory list is not exhaustive, and the Court can consider the Debtor's conduct both before and after case commencement.[38] "Cause" may exist to appoint a

---

[33] *Samy*, 673 B.R. at 588 (citation omitted); *In re Golden Park Estates, LLC*, No. 14-12253 T11, 2015 WL 3643479, at *5 (Bankr. D.N.M. June 11, 2015).

[34] *Golden Park*, 2015 WL 3643479, at *5 (predicting that the Tenth Circuit "likely would use a preponderance of the evidence standard.").

[35] *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011) ("The decision whether the facts establish cause under § 1104(a)(1) is vested in the court's discretion and will be reviewed under an abuse of discretion standard. The court is vested with even broader discretionary powers under § 1104(a)(2) and may consider equitable factors to determine whether a trustee ins in the interests of the estate and its creditors." (citation omitted).

[36] *Samy*, 673 B.R. at 590 ("While an extraordinary remedy, once a bankruptcy court determines that 'cause' exists for appointment of a trustee under section 1104(a)(1) or that appointment of a trustee would be in the best interest of creditors under section 1104(a)(2), it has no discretion but must appoint a trustee." (quoting *In re Sims*, 226 B.R. 284, *4 (10th Cir. BAP 1997) (unpublished)); *Celeritas Techs.*, 446 B.R. at 518 ("If the facts of the case support the appointment of a trustee under either subsection §§ 1104(a)(1) or (2), the court has no discretion, but must appoint a trustee." (citation omitted)).

[37] § 1104(a)(1).

[38] § 1104(a)(1); *Samy*, 673 B.R. at 591 ("cause" includes conduct either before or after case commencement); *Peak Serum*, 623 B.R. at 620 (same).

- 15 -

chapter 11 trustee "when there are irremediable conflicts or when creditors have completely lost confidence in the management of the business."[39] However, because most debtors who seek bankruptcy protection have likely experienced some level of mismanagement, "gross mismanagement" necessitating the appointment of a chapter 11 trustee requires something more significant, such as "extreme ineptitude."[40]

*Relevant factors under § 1104(a)(2)*

Section 1104(a)(2) "contains a flexible standard that allows a court to look to the practical realities and necessities" of the case.[41] The Court "may consider equitable factors to determine whether a trustee is in the best interests of the estate and its creditors."[42] Equitable factors include:

(i)     the trustworthiness of the debtor;
(ii)    the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;
(iii)   the confidence—or lack thereof—of the business community and of creditors in present management;
(iv)    the benefits derived by the appointment of a trustee, balanced against the costs of appointment.[43]

Appointment of a chapter 11 trustee may be appropriate when there "is either a perceived dishonesty or withholding of information" or the debtor has shown an "inability to provide accurate records and reports."[44]

---

[39] 7 Collier on Bankruptcy, ¶ 1104.02[1] (Richard Levin & Henry J. Sommer eds., 16th ed.)
[40] *Samy,* 673 B.R. at 591 ("'Gross mismanagement['] suggests some extreme ineptitude on the part of management to the detriment of the organization. But it must rise above simple mismanagement to achieve the level envisioned by the Code. Some mismanagement exists in every insolvency case." (citation omitted)); *In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988) ("Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization." (citing *In re Brown*, 31 B.R. 583 (Bankr. D.D.C. 1983))).
[41] *Plaza de Retiro*, 417 B.R. at 640 (citations omitted).
[42] *Celeritas Techs.*, 446 B.R. at 518 (citing *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989)).
[43] *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (citations omitted)).
[44] *Plaza de Retiro,* 417 B.R. at 641.

- 16 -

Ultimately, whether to appoint a chapter 11 trustee is a fact intensive inquiry, and the Court must base its decision on the totality of the circumstances.[45]

A. *Whether "cause" exists to appoint a chapter 11 trustee*

After considering the totality of the circumstances, the Court concludes, under the preponderance of the evidence standard, that although it is a close call, Century Bank has not demonstrated sufficient "cause" to appoint a chapter 11 trustee under § 1104(a)(1). However, the Court will appoint a chapter 11 trustee if Debtor fails to satisfy one of the requirements the Court will impose for the Debtor to avoid appointment of a chapter 11 trustee. Debtor's pre- and post-petition conduct in this case does raise concerns. Pre-petition, Mr. Pergola, on behalf of Debtor, terminated the VRA, even though termination of the VRA meant that Debtor would not retain the significant benefits of the VRA while remaining responsible for the cleanup of the Property. Mr. Pergola's belief that the letter dated April 29, 2024 from the NMED released Debtor from any liability or obligation to remediate the Property was not a reasonable interpretation of the letter. Mr. Pergola gave no reasonable explanation for refusing to enter into the written access agreement to allow EA Engineering to conduct a site assessment and abatement activities on the Property. He did not sign the access agreement until after Cal-Maine filed a motion in the bankruptcy case requesting an order requiring Debtor to sign the access agreement. These actions suggest poor judgment and mismanagement of the Debtor.

Century Bank also complains about omissions and misstatements in the Debtor's schedules and statement of financial affairs, and asserts that the Debtor's only goal in this bankruptcy case is to cause further delay until Debtor can sell the Property for a price that will

---

[45] *Id.* at 640 ("[T]he decision to appoint a trustee is fact intensive and must be made on a case by case basis. The Court's task is to determine whether the totality of the circumstances warrant appointment of a trustee." (citing *In re Sundale, Ltd.*, 400 B.R. 890, 901 (Bankr. S.D. Fla. 2009))).

allow Mr. Pergola to realize a significant return on his investment. Debtor retained new bankruptcy counsel post-petition, and has since filed amended schedules and an amended statement of financial affairs. It is not unreasonable for the Debtor's principals to seek to realize equity in the Debtor's Property. Debtor's inability to complete the improvements on the Property thus far appears to be attributable to lack of funding, not mismanagement.

Overall, Debtor's conduct does not warrant the appointment of a chapter 11 trustee at this time. Although some of Mr. Pergola's conduct evidences poor judgment and mismanagement, the Court concludes that, under the totality of circumstances, such conduct does not rise to the level of gross mismanagement or incompetence sufficient to support a finding of "cause" to appoint a chapter 11 trustee under § 1104(a)(1). Debtor currently has competent bankruptcy counsel to represent it in this case, and Mr. Pergola has pledged to follow his counsel's advice.

B. *Whether a chapter 11 trustee is warranted under § 1104(a)(2)*

After evaluating the relevant factors under § 1104(a)(2), the Court concludes that the appointment of a chapter 11 trustee does not best serve the interests of creditors, equity security holders, and other interests of the estate as a whole. Although Debtor's past performance raises concerns, and Century Bank and Cal-Maine have lost all confidence in the Debtor, it is appropriate to give Debtor an opportunity to market and sell the Property, with Court imposed controls that protect creditors.

Debtor does not intend to operate a business on the Property. Rather, Debtor's Plan proposes to sell the Property through a private sale, and if the Debtor is unable to sign a purchase and sale agreement for the Property within six months, to sell the Property by public auction. Debtor's principal, Karl Pergola, has pledged to follow the advice of his bankruptcy counsel in this case. This chapter 11 case has been pending for less than six months, and Debtor has already

- 18 -

filed a Chapter 11 Plan and Disclosure Statement and retained an appraiser for the Property. Mr. Pergola has a substantial incentive to maximize value in a sale of the Property. He has loaned a substantial amount of his own money to position Debtor to maximize value in a sale that would pay all creditors in full and yield a good dividend for Debtor's members.

On the other hand, Debtor has an incentive to delay the sale to give him more time to complete Debtor's portion of the Development Project. Century Bank does not trust the Debtor to sell the Property within a reasonable time. Provided Debtor meets the deadlines the Court will impose for the sale of the Property, appointment of a chapter 11 trustee does not best serve the interests of creditors, equity security holders, and other interests of the estate considered as a whole. If Debtor fails to meet one of the deadlines, the Court will appoint a chapter 11 trustee.

Century Bank's claim is adequately protected by the current estimated value of the Property, even without any additional improvements. Completion of the improvements required under Part C of Debtor's agreement with Bernalillo County will greatly increase the value of the Property. Debtor should be given an opportunity to increase the value of the Property and realize a higher sales price, even though, based on the evidence before the Court, it is uncertain at this time whether Debtor will ultimately secure public funding to complete the improvements. Appointment of a chapter 11 trustee will inject uncertainty, create an additional layer of administrative expense for the estate, and yields the prospect of prejudicing creditors other than Century Bank rather than benefiting them.

On the motion of a party in interest, the Court will order the appointment of a chapter 11 trustee, if Debtor fails to meet any one of the following requirements:

1. By April 10, 2026, Debtor must file a motion to employ a broker to market and obtain a buyer for the Property and send notice of a 21-day period to object to the motion to the creditors on official mailing list in this case.

2. If no objection to the Debtor's motion to employ a broker is timely filed, an order approving the Debtor's employment of the broker must be entered by May 12, 2026.[46]

3. If no objection to the amended disclosure statement is filed, an order approving a disclosure statement must be entered by April 30, 2026.[47]

4. Debtor must file an amended plan by April 3, 2026, that contains at least the following provisions:

(a) The broker will begin marketing the Property for sale upon entry of an order approving Debtor's employment of the broker; and

(b) Debtor will sell the Property in a public auction if (i) within the later of six months after entry of an order approving Debtor's employment of the broker or 120 days after entry of an order confirming an amended plan, the Debtor has not entered into a Purchase Agreement for the sale of the Property for a sales price of at least $6.5 million with earnest money of at least $500,000, or (ii) if such a Purchase Agreement is timely executed and the earnest money was deposited but the sale of the Property under the Purchase Agreement has not closed (including payment of at least that portion of the purchase price that will pay in full all claims in the bankruptcy case, pre- or post-petition)

---

[46] If an objection to a motion to employ a broker is timely filed, the May 12, 2026, deadline will not apply but the Court will set the motion for a final hearing without first conducting a preliminary hearing. If no objection to the motion to employ a broker is timely filed, Debtor's counsel should submit an order to the Court by eOrders that grants the motion.

[47] The Court has shortened the time to object to an amended disclosure statement to 14 days. (Doc. 170). If no objection to disclosure statement is timely filed, the Court will hold a final hearing on approval of the disclosure statement on short notice.

- 20 -

within 90 days after execution of the Purchase Agreement. Such date on which Debtor is required to sell the Property by auction is called the "Auction Trigger Date." The Property will be sold under § 363(b) and also under § 363(f) to the extent the requirements of subsection (f) are satisfied.

5.      An order confirming an amended plan must be entered within 60 days after entry of an order approving the amended disclosure statement.

6.      Within 30 days after entry of an order confirming an amended plan, Debtor must file a motion to establish auction procedures, in the event an auction of the Property is held, and send notice of a 21-day objection deadline. The auction procedure must include an outside date for the auction. Parties in interest will have the opportunity to object to the auction procedure, including when the auction will be held.

In addition, the Court will appoint a chapter 11 trustee on the motion of a party in interest, if

A.      The Court enters an order denying Debtor's motion to employ a broker, or

B.      The Debtor materially defaults in its obligations under the amended plan that are set forth in paragraph 4 above.

Based on the foregoing, the Court will deny Century Bank's Emergency Motion to Appoint Chapter 11 Trustee. The Court will enter a separate order consistent with this Memorandum Opinion that details the conditions and requirements for Debtor's retention of the broker, its chapter 11 plan, and the sale of the Property.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: March 13, 2026

- 21 -

COPY TO:

<u>Attorney for Debtor</u>
Erin J Kennedy
Forman Holt
365 West Passaic Street, Suite 400
Rochelle Park, NJ 07662

<u>Attorney for Century Bank</u>
James Jurgens
100 La Salle Cir Ste A
Santa Fe, NM 87505-6976

<u>Attorney for Cal-Maine Foods, Inc.</u>
Pete V Domenici, Jr
Domenici Law Firm, P.C.
P. O. Box 4295
Albuquerque, NM 87196

<u>Attorney for United States Trustee</u>
Daniel White
DOJ-Ust
PO Box 608
Albuquerque, NM 87103-0608